IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BNC BANCORP and )
BANK OF NORTH CAROLINA, )
)
    Plaintiffs, )
)
    v. ) 1:15-cv-793
)
BNCCORP, INC. and )
BNC NATIONAL BANK, )
)
    Defendants. )

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Bank of North Carolina filed this action against BNC National Bank,[1] seeking a declaratory judgment as to the parties' respective rights in the "BNC" trademark. Before the Court is BNC National Bank's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 26), which seeks to enjoin Bank of North Carolina from rebranding its North Carolina operations from "Bank of North Carolina" to "BNC Bank." On April 21, 2016, and April 28, 2016, the matter came on for hearing before the Court. The Court denied BNC National Bank's motion at the hearing on April 28, 2016, and this Memorandum Opinion and Order sets forth the Court's basis for its decision and formally enters the order.

---

[1] Plaintiffs include Bank of North Carolina and its parent company, BNC Bancorp. In this opinion, the Court will use "Bank of North Carolina" to refer to both plaintiffs. Similarly, Defendants include BNC National Bank and its parent company, BNCCORP, INC. The Court will use "BNC National Bank" to refer to both defendants.

## I. BACKGROUND

### A. The Parties

Bank of North Carolina is a commercial bank incorporated and chartered under the laws of North Carolina. It opened its doors in 1991 and has operated in North Carolina since that time. In addition, beginning in 2010, it opened branches in South Carolina and Virginia. In 2011, Bank of North Carolina obtained a federal trademark registration for the BNC BANK word and design mark shown below, in connection with banking services:



(Registration Certificate, ECF No. 55-1.) In South Carolina and Virginia, Bank of North Carolina is known as "BNC Bank." In December 2015, the bank announced plans to rebrand its North Carolina operations from "Bank of North Carolina" to "BNC Bank" as well.

BNC National Bank is a federally chartered bank with branches in North Dakota, Minnesota, and Arizona. It was formed in 1990 and adopted its current name in 1995. In December 2014 and January 2015, BNC National Bank filed federal trademark applications for the word marks BNC and BNC NATIONAL BANK, in connection with banking and financial services. Bank of North Carolina opposed the registration of these marks, and proceedings related to the registration have been suspended pending the outcome of this litigation. (TTAB Order 1, ECF No. 55-24.)

## B. Procedural Posture

Litigation over the parties' trademark rights began a few months before the initiation of this action. In May 2015, BNC National Bank filed an action against Bank of North Carolina in this Court, alleging various trademark-related claims and seeking to cancel Bank of North Carolina's federal trademark registration. In September 2015, BNC National Bank voluntarily dismissed that action without prejudice and filed a similar action in the United States District Court for the District of Minnesota. Two weeks later, Bank of North Carolina filed this action, primarily seeking a declaratory judgment related to the parties' trademark rights. The District of Minnesota then dismissed the action in that court for lack of personal jurisdiction. The action before this Court represents the only remaining action between the parties in federal court related to these trademark claims.

In January 2016, BNC National Bank responded to Bank of North Carolina's Complaint with several counterclaims.[2] BNC National Bank also filed the instant Motion for Temporary Restraining Order and Preliminary Injunction. It asserts this motion was prompted by Bank of North Carolina's plans to rebrand its North Carolina operations from "Bank of North Carolina" to "BNC Bank." In its motion, BNC National Bank seeks to enjoin Bank of North Carolina from taking any rebranding actions, including:

> (1) Rebranding [Bank of North Carolina's] North Carolina operations and/or branches to incorporate, in whole or in part, "BNC" or

---

[2] BNC National Bank asserts claims for: (1) unfair competition and passing off, in violation of § 43(a) of the Lanham Act and the common law; (2) false designation of origin, in violation of § 43(a) of the Lanham Act; (3) trademark and/or trade name infringement, in violation of the common law; (4) violation of the North Carolina Unfair and Deceptive Trade Practices Act; and (5) unjust enrichment. In a sixth claim, BNC National Bank seek cancellation of Bank of North Carolina's federal trademark registration.

3

> "BNC BANK", including refraining from adding or offering any new "BNC" branded product lines or services during the pendency of this lawsuit; and
>
> (2) Installing any hard/permanent signage incorporating, in whole or in part, "BNC" or "BNC BANK" at any North Carolina branch locations during the pendency of this lawsuit.

(Defs.' Mot. 3, ECF No. 26.) Though BNC National Bank asserts various counterclaims, its request for a preliminary injunction is based solely on a theory of trademark infringement under the Lanham Act. (See Defs.' Mem. 17–18, ECF No. 29.)

### C. The Lanham Act

BNC National Bank proceeds under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[3] The plain language of § 43(a) creates unfair competition causes of action for false association and false advertising. Belmora LLC v. Bayer Consumer Care AG, 819 F.3d 697, 706 (4th Cir. 2016). In addition, § 43(a) has been interpreted to create a cause of action for "traditional trademark infringement of unregistered marks," Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 30 (2003), which is "a part of the broader law of unfair competition," Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 428 (2003). BNC National Bank has not obtained a federal trademark registration for either BNC or BNC NATIONAL BANK, the marks it seeks to protect in this action. It therefore relies on § 43(a) for its trademark infringement claims.

---

[3] The Lanham Act is the federal trademark statute, "intended to make 'actionable the deceptive and misleading use of marks,' and 'to protect persons engaged in . . . commerce against unfair competition.'" Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28 (2003) (quoting 15 U.S.C. § 1127). It provides for the federal registration of trademarks, as well as for the protection of both registered and unregistered marks. See Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209 (2000).

4

The standard for establishing trademark infringement under the Lanham Act is the same for both registered and unregistered marks. See Radiance Found., Inc. v. NAACP, 786 F.3d 316, 321–25 (4th Cir. 2015) (applying the same elements to trademark infringement claims under § 32, which protects registered marks, and § 43(a), which protects unregistered marks); Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006) (stating that "the same analysis applies to claims of trademark infringement under § 32" as for claims under § 43(a)). To establish trademark infringement under the Lanham Act, BNC National Bank must prove: (1) that it owns a valid mark; (2) that Bank of North Carolina used the mark "in commerce" and without BNC National Bank's authorization; (3) that Bank of North Carolina used the mark (or an imitation of it) "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) that Bank of North Carolina's use of the mark is likely to confuse consumers. See Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 152 (4th Cir. 2012) (quoting 15 U.S.C. § 1114(a)) (articulating the standard for trademark infringement of a registered mark).[4]

## II. STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). It involves "the exercise of a

---

[4] Of note, the Fourth Circuit in a false association and false advertising case recently held that "§ 43(a) does not require that a [party] possess or have used a trademark in U.S. commerce as an element of [its] cause of action." Belmora LLC v. Bayer Consumer Care AG, 819 F.3d 697, 706 (4th Cir. 2016). Belmora, however, involved § 43(a) claims for false association and false advertising, and the court found it "important to emphasize" that Belmora was "not a trademark infringement case." Id. at 708; see Seat Sack, Inc. v. Childcraft Educ. Corp., 417 F. App'x 931, 933 (Fed. Cir. 2011) (stating that a plaintiff claiming false advertising under § 43(a) "need not demonstrate that it has protectable trademark rights," unlike a party claiming trademark infringement of an unregistered mark).

5

very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." Cantley v. W.V. Reg'l Jail & Corr. Facility Auth., 771 F.3d 201, 207 (4th Cir. 2014) (quoting Centro Tepeyac v. Montgomery Cty., 722 F.3d 184, 188 (4th Cir. 2013) (en banc)). Whether to grant this relief is in the sound discretion of the court. Centro Tepeyac, 722 F.3d at 188; see Bethesda Softworks, L.L.C. v. Interplay Entm't Corp., 452 F. App'x 351, 353 (4th Cir. 2011) (per curiam) (stating that a district court has discretion to deny a preliminary injunction "even when a plaintiff has made the requisite showing").

The party seeking a preliminary injunction bears the burden of making a "clear showing" it is entitled to such relief. Rebel Debutante LLC v. Forsythe Cosmetic Grp., Ltd., 799 F. Supp. 2d 558, 568 (M.D.N.C. 2011); see Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011). To prevail on its motion for preliminary injunction, BNC National Bank "must demonstrate that (1) [it is] likely to succeed on the merits; (2) [it] will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in [its] favor; and (4) the injunction is in the public interest." G.G. v. Gloucester Cty. Sch. Bd., --- F.3d ----, 2016 WL 1567467, at *9 (4th Cir. 2016) (quoting League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 236 (4th Cir. 2014)). BNC National Bank must satisfy *each* of these four requirements. See Cantley, 771 F.3d at 207. Thus, if BNC National Bank fails to demonstrate any one of these requirements, its Motion for Temporary Restraining Order and Preliminary Injunction must be denied.

### III. DISCUSSION

BNC National Bank must first make a clear showing that it is likely to succeed on the merits of its trademark infringement claim. It must establish: (1) that it owns a valid mark;

6

(2) that Bank of North Carolina used the mark "in commerce" and without BNC National Bank's authorization; (3) that Bank of North Carolina used the mark (or an imitation of it) "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) that Bank of North Carolina's use of the mark is likely to confuse consumers. See Rosetta Stone, 676 F.3d at 152 (quoting 15 U.S.C. § 1114(a)). At the hearing, BNC National Bank limited its evidence and argument to two of these elements: (1) whether it owns a valid mark, and (2) whether Bank of North Carolina's use of the mark causes a likelihood of confusion. The Court agrees that these are the elements in dispute.

### A. Ownership of a Valid Mark

BNC National Bank must first demonstrate a likelihood that it can establish ownership of a valid mark. The bank claims common law rights in the BNC and BNC NATIONAL BANK marks ("BNC marks"). "At common law, trademark ownership is acquired by actual use of the mark in a given market." Emergency One, Inc. v. Am. Fire Eagle Engine Co., 332 F.3d 264, 267 (4th Cir. 2003). "To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." Id. (quoting Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1219 (9th Cir. 1996)). "Use" must be "deliberate and continuous, not sporadic, casual or transitory." Larsen v. Terk Techs. Corp., 151 F.3d 140, 146 (4th Cir. 1998) (quoting La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1271–72 (2d Cir. 1974)). Thus, to make a clear showing of a likelihood of success as to ownership of the BNC marks, BNC

7

National Bank must demonstrate that it was the first to use the marks in the sale of goods or services, and that its use was deliberate and continuous.

Though "trademark ownership confers an exclusive right to use the mark," that right is "limited to areas where [the mark] had been used and the claimant of the mark had carried on business." Emergency One, 332 F.3d at 267, 268 (alteration in original) (quoting Armand's Subway, Inc. v. Doctor's Assocs., Inc., 604 F.2d 849, 849 (4th Cir. 1979)). BNC National Bank's trademark ownership rights therefore depend not only on how and when it used the marks, but also on *where* it used the marks. See id. at 269 ("[A party] asserting a claim of infringement against common-law trademark ownership rights bears the burden of establishing its exclusive right to use the mark by actual use *in a given territory*." (emphasis added)). Thus, to establish ownership of the marks in the territory where it seeks to assert ownership rights, BNC National Bank must demonstrate that it used the marks in the sale of goods or services *in North Carolina* before Bank of North Carolina, and that it did so deliberately and continuously. This Court concludes that BNC National Bank has failed to demonstrate a likelihood of success on the element of ownership of a valid mark.

BNC National Bank presented evidence, as follows: BNC National Bank adopted its current name in 1995. (Hr'g Tr. 40:1–8, ECF No. 69.) By the following year, 1996, it had general banking customers in forty-eight states, including North Carolina. (Cleveland Decl. ¶ 5, ECF No. 30.) Specifically, it had three general banking accounts linked to addresses in North Carolina that year. (Suppl. Cleveland Decl. ¶ 6, ECF No. 48.) Five years later, in 2001, BNC National Bank had thirteen general banking accounts with North Carolina addresses. (Hr'g Tr. 11:15, ECF No. 69.) Today, some fifteen years later, it has fifty-four

8

such accounts. (Suppl. Cleveland Decl. ¶ 6, ECF No. 48.) BNC National Bank also has mortgage and wealth management customers nationwide, including in North Carolina. (See Brendel Decl. ¶ 3, ECF No. 31; Andresen Decl. ¶ 3, ECF No. 32.) It closed its first mortgage loan in North Carolina in 2008 and has consistently closed mortgage loans in the state every year since 2008. (See Suppl. Cleveland Decl. ¶ 5, ECF No. 48.) As for wealth management, BNC National Bank appears to have had at least one customer in North Carolina in 2007, (see ECF No. 48-3 at 4), though the evidence does not show when it began offering wealth management services in the state.

BNC National Bank claims to use the BNC marks in North Carolina when it communicates with its North Carolina customers. (See Cleveland Decl. ¶ 5, ECF No. 30.) These communications include account statements, notices, brochures, and business cards, for example, which are delivered through mail, email, and BNC National Bank's website, as well as its mobile banking application. (See Hr'g Tr. 41:23–42:7, 45:25–46:7, ECF No. 69.) All communications bear the BNC mark. (See id. at 42:8–10, 46:8–9.) The earliest communication BNC National Bank may have mailed to North Carolina is a brochure informing customers of BNC Bank Line, a free service that allows customers to make account inquiries and transactions over the phone. (ECF No. 30-1.) BNC National Bank's Chief Operating Officer, Shawn Cleveland, testified that the brochure "probably went in statements starting in December of '95 or January or '96." (Hr'g Tr. 64:15–16, ECF No. 69.)

Based on evidence outlined above, BNC National Bank claims ownership rights to the BNC marks in North Carolina. It claims to have used the marks in the state "as early as 1996" and to have made "continual and uninterrupted" use of the marks since then. (Defs.'

9

Mem. 18, ECF No. 29.)  BNC National Bank also claims to have preceded Bank of North Carolina's use by at least two years, making it the "undisputed senior use[r]."  (See id.)

Bank of North Carolina disagrees.  It claims to have used the BNC mark "[a]t least as early as 1995," one year before BNC National Bank's earliest claimed use of the mark in North Carolina.  (Pls.' Opp'n 3, ECF No. 53; Callicutt Decl. ¶ 15, ECF No. 54.)  Bank of North Carolina's evidence of such early use comes from the testimony of its President and Chief Executive Officer, Richard Callicutt.  At the hearing, Mr. Callicutt discussed two initiatives that the bank introduced shortly after opening:  BNC Free (a free checking account) and BNC Mortgage (a small mortgage business).  (See Hr'g Tr. 97:16–98:1, ECF No. 69.)  He testified that in September 1992, when Bank of North Carolina moved from a temporary location to its headquarters, he remembers hanging BNC Free and BNC Mortgage banners on the front of the new building.  (Id. at 98:2–:9.)  BNC Free and BNC Mortgage were also part of the marketing for a new branch opened in 1995.  (Id. at 100:3–6.)  Relying on Mr. Callicutt's testimony, Bank of North Carolina claims to have used the BNC mark in North Carolina *by* 1995.

Considering the arguments and evidence before the Court, the Court concludes that BNC National Bank has not met its burden of demonstrating it is likely to succeed in proving ownership of the BNC marks in North Carolina.  As stated earlier, BNC National Bank must clearly show that there is a likelihood that it was the first to deliberately and continuously use the marks in the sale of goods or services in North Carolina.  Highly relevant to this inquiry is the date of BNC National Bank's claimed first use:  1996.  To demonstrate use of the marks in 1996, BNC National Bank relies solely on the fact that it

10

had three general banking accounts with North Carolina addresses and that it regularly provides customers with communications bearing the BNC marks. (See Suppl. Cleveland Decl. ¶ 6, ECF No. 48; Cleveland Decl. ¶ 5, ECF No. 30.) However, BNC National Bank presented no evidence that its North Carolina customers actually received communications bearing the marks. Though it "probably" mailed a brochure advertising BNC Bank Line to its customers in December 1995 or January 1996, (Hr'g Tr. 64:15–16, ECF No. 69), the Court does not know whether it had acquired any North Carolina customers by that time. Quite simply, BNC National Bank has not shown a likelihood that the marks made any appearance in North Carolina in 1996. Moreover, Bank of North Carolina presented evidence that it advertised and offered BNC-branded products from 1992 to 1995, calling into question whether BNC National Bank can demonstrate first use by demonstrating use of the marks in 1996.

Nor is the Court convinced that BNC National Bank's use of the marks was either deliberate or continuous. According to the testimony of Ms. Cleveland, BNC National Bank does not know how it has acquired customers in North Carolina. (See Hr'g Tr. 70:25–71:6, ECF No. 69.) And it does not know whether it had any customers in North Carolina in the years immediately following 1996. Though BNC National Bank claims to have maintained general banking customers "consistently from 1996 to the present," (Cleveland Decl. ¶ 5, ECF No. 30), Ms. Cleveland admitted the possibility that the bank had zero customers in North Carolina during some of this time, (Hr'g Tr. 66:1–8, ECF No. 69). This showing does not suggest deliberate and continuous use; rather, it appears more sporadic, casual, and transitory. See Larsen, 151 F.3d at 146; see also Allard Enters., Inc. v. Advanced

11

Programming Res., Inc., 146 F.3d 350, 358 (6th Cir. 1998) (recognizing that "even a single use in trade may sustain trademark rights *if followed by continuous commercial utilization*" (emphasis added) (quoting Blue Bell, Inc. v. Farah Mfg. Co., 508 F.2d 1260, 1265 (5th Cir. 1975))).

BNC National Bank has failed to demonstrate a likelihood that it can assert trademark ownership rights in North Carolina, the first requirement for a trademark infringement claim.

### B. Likelihood of Confusion

Even if, for the sake of argument, BNC National Bank can demonstrate ownership of a valid mark, its trademark infringement claim would also require proof that Bank of North Carolina's trademark use is likely to cause confusion among consumers. Thus, to demonstrate a likelihood of success on the merits for purposes of its preliminary injunction request, BNC National Bank must also demonstrate a likelihood of confusion. A likelihood of confusion exists if Bank of North Carolina's trademark use "is likely to produce confusion in the minds of consumers about the origin of the goods or services in question." Swatch AG v. Beehive Wholesale, LLC, 739 F.3d 150, 158 (4th Cir. 2014) (quoting CareFirst of Md., Inc. v. First Care, P.C., 434 F.3d 263, 267 (4th Cir. 2006)). This is an inherently factual inquiry. Id. To guide this inquiry, the Fourth Circuit has articulated several factors:

> (1) the strength or distinctiveness of [BNC National Bank's] mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) [Bank of North Carolina's] intent; (7) actual confusion; (8) the quality of [Bank of North Carolina's] product; and (9) the sophistication of the consuming public.

12

Id. (quoting George & Co., LLC v. Imagination Entm't Ltd., 575 F.3d 383, 393 (4th Cir. 2009)). These factors are not exhaustive or mandatory, they are not equally important, and not every factor is relevant in every case. Id. at 158–59. Additionally, when evaluating likelihood of confusion, "it is important to remember that 'trademark infringement protects only against mistaken purchasing decisions and not against confusion generally.'" Radiance Foundation, 786 F.3d at 324 (quoting Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 583 (2d Cir. 1991)).

At the outset, the Court eliminates several factors from consideration in this case. These factors include the fourth and fifth, related to the similarity of the parties' facilities and advertising, which the Court does not have enough information to evaluate. The Court also eliminates from consideration the eighth and ninth factors, related to the quality of Bank of North Carolina's product and the sophistication of the consuming public, which do not apply in this case. See George, 575 F.3d at 399 (explaining that the quality of an alleged infringer's product is relevant in "situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods" (quoting Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 467 (4th Cir. 1996))); id. at 400 (explaining that the sophistication of the consuming public is relevant "when the relevant market is not the public at-large" (quoting Sara Lee, 81 F.3d at 467)).

Of the remaining factors, two factors clearly weigh in favor of a finding of likelihood of confusion. Under the second factor, similarity of the marks, the Court considers "the dominant portions of the parties' marks" to determine "whether there exists a similarity in sight, sound, and meaning which would result in confusion." George, 575 F.3d at 396.

13

Here, the BNC NATIONAL BANK mark used by BNC National Bank and the BNC BANK mark used by Bank of North Carolina are similar. The dominant portion of each mark is BNC, and both marks refer to banks. Under the third factor, the Court considers the similarity of the goods and services offered by each party. Though "the goods [or services] in question need not be identical or in direct competition with each other," id. at 397, both BNC National Bank and Bank of North Carolina offer banking and financial services. Thus, both the second and third factors weigh in favor of a finding of likelihood of confusion.

Other factors, however, weigh against a finding of likelihood of confusion. Under the first factor, the Court considers the strength of BNC National Bank's claimed marks, which "ultimately depends on the degree to which the [marks] [are] associated by prospective purchasers with a particular source." Id. at 396 (quoting Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc., 130 F.3d 88, 93 (4th Cir. 1997)). Because BNC National Bank seeks to assert trademark rights in North Carolina, the Court is specifically concerned with the strength of its marks in North Carolina. BNC National Bank has presented no argument or evidence on this point. Additionally, under the sixth factor, the Court considers whether Bank of North Carolina intended to confuse consumers by adopting the BNC BANK mark. Nothing in the record supports such a finding. Thus, the first and sixth factors weigh against a finding of likelihood of confusion.

The Court lastly considers the seventh factor, actual confusion, which is the primary focus of BNC National Bank's argument. "[E]vidence of actual confusion is 'often paramount' in the likelihood of confusion analysis." George, 575 F.3d at 393 (quoting

14

Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 804 (4th Cir. 2001)). "This evidence is entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion." Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 937 (4th Cir. 1995). However, "[i]f there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight." George, 575 F.3d at 398 (quoting J. Thomas McCarthy, 4 McCarthy on Trademarks & Unfair Competition § 23:14 (4th ed.)).

Here, BNC National Bank claims to present "a mountain of evidence" of actual confusion, (Hr'g Tr. 19:25, ECF No. 69), including the following: First, from July 2015 to March 2016, BNC National Bank's employees kept track of over one hundred instances of alleged confusion. (Cleveland Decl. ¶ 6, ECF No. 30; Second Suppl. Cleveland Decl. ¶ 6, ECF No. 60-1; see ECF No. 30-2; ECF No. 60-1 at 17–19.) Though many of these entries are incomprehensible,[5] they seem to primarily describe instances where a Bank of North Carolina customer mistakenly called BNC National Bank or visited BNC National Bank's website. Second, a Twitter user posted a tweet complaining that "BNC has the worst online banking setup ever." (Cleveland Decl. ¶ 8, ECF No. 30; see ECF No. 30-3.) Though she tagged BNC National Bank in her post, she clarified that she was talking about "BNC National Bank located in SC." (ECF No. 30-3.) Third, a vendor emailed Bank of North

---

[5] Several of these entries state only "N/A." (ECF No. 30-2 at 8.) Others include short phrases like "North Carolina" or "Looked on internet," (id. at 9, 10), which convey little information and require the Court to speculate as to what happened in each instance.

15

Carolina but mistakenly copied BNC National Bank employees on the email. (Suppl. Cleveland Decl. ¶ 8, ECF No. 48; see ECF No. 48-4 at 2.) Fourth, a professional auditing company seeking to verify confidential information related to a Bank of North Carolina customer mailed its request to BNC National Bank instead. (Second Suppl. Cleveland Decl. ¶ 3, ECF No. 60-1; see id. at 9–12.) Finally, a South Carolina resident applied on BNC National Bank's website to open a checking account, thinking she was applying to open an account with Bank of North Carolina. (Second Suppl. Cleveland Decl. ¶ 4, ECF No. 60-1; see id. at 14–15.)

While BNC National Bank's evidence reflects some instances of confusion, the Court must consider "whether this is the type of confusion against which the Lanham Act was designed to protect." Lang, 949 F.2d at 582. A trademark is meant "to protect the public from confusion about 'the identity of the enterprise from which goods and services are purchased.'" Rebel Debutante, 799 F. Supp. 2d at 581 (quoting Toolchex, Inc. v. Trainor, 634 F. Supp. 2d 586, 594 (E.D. Va. 2008)). Thus, "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." Radiance Foundation, 786 F.3d at 324 (quoting Lang, 949 F.2d at 583). In Lang, the Second Circuit considered a situation where one party received over four hundred phone calls and several letters from people attempting to reach a different party with a similar name. 949 F.2d at 582. Finding that "no evidence link[ed] the confusion evinced by the calls to any potential or actual effect on consumers' purchasing decisions," the court held that the evidence did not raise a genuine issue of actual confusion. Id. at 583.

16

The same is true here. BNC National Bank's evidence consists primarily of individuals intending to reach Bank of North Carolina but contacting BNC National Bank instead. While these individuals contacted the wrong bank, there is no evidence they were confused about the source of their banking services. That is, while these individuals may have believed BNC National Bank's phone number, website, and Twitter handle belonged to Bank of North Carolina, there is no indication that they believed they were banking with BNC National Bank, rather than Bank of North Carolina. Similarly, there is no indication that the vendor and professional auditing company emailed or mailed information meant for Bank of North Carolina to BNC National Bank under the belief they were doing business with BNC National Bank. At most, this evidence suggests perhaps a lack of careful attention on the part of the companies, not confusion in the minds of consumers.

The only piece of evidence that the Court finds relevant to the actual confusion inquiry is Ms. Cleveland's testimony that an individual in South Carolina attempted to open a checking account with Bank of North Carolina by submitting an application on BNC National Bank's website. This evidence may suggest a mistaken purchasing decision. The Court, however, must evaluate this instance of actual confusion "against the background of the number of opportunities for confusion," meaning that "[e]vidence of only a small number of instances of actual confusion may be dismissed as *de minimis*." George, 575 F.3d at 398 (quoting McCarthy § 23:14). Given that both banks have opened thousands of bank accounts, this single instance of actual confusion carries little weight. The Court therefore concludes that the factor of actual confusion does not weigh in favor of a finding of likelihood of confusion.

17

Case 1:15-cv-00793-LCB-JEP   Document 70   Filed 06/16/16   Page 17 of 19

Weighing the factors, while the parties have similar marks and offer similar goods and services, BNC National Bank has not shown that any segment of consumers in North Carolina associates the BNC marks with BNC National Bank. There is also no indication that Bank of North Carolina adopted the BNC BANK mark with the intent of causing consumer confusion, or that a sufficient amount of actual confusion has taken place. On balance, the Court concludes that BNC National Bank has not made a clear showing of likelihood of confusion. Quite simply, there is little indication that consumers are likely to be confused about "the origin of the goods or services" offered by each bank. See Swatch, 739 F.3d at 158. BNC National Bank has therefore failed to demonstrate a likelihood of success in establishing the fourth element of its trademark infringement claims, likelihood of confusion.

### C. Conclusion

In failing to demonstrate a likelihood of success on the merits related to ownership of a valid mark and likelihood of confusion, two of the critical elements of a trademark infringement claim, BNC National Bank's Motion for Temporary Restraining Order and Preliminary Injunction must be denied. Further, it serves no purpose to discuss the remaining requirements for granting the relief sought, including the likelihood of irreparable harm, balance of hardships, and public interest. See JAK Prods., Inc. v. Bayer, 616 F. App'x 94, 95 (4th Cir. 2015) (per curiam) (affirming the district court's denial of a motion for preliminary injunction based solely on a finding that the plaintiffs had failed to demonstrate a likelihood of success on the merits).

18

## ORDER

IT IS THEREFORE ORDERED, as ruled from the bench on April 28, 2016, that BNC National Bank's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 26) is DENIED.

IT IS FURTHER ORDERED, as ruled from the bench on April 21, 2016, that Bank of North Carolina's Emergency Motion to Strike Supplemental Declaration of Shawn Cleveland (ECF No. 49) is DENIED.

IT IS FURTHER ORDERED that BNC National Bank's Motion for Ex Parte Order Granting Leave to File Newly Obtained Evidence in Support of Temporary Restraining Order and Preliminary Injunction (ECF No. 60) is GRANTED.

This, the 16th day of June, 2016.

                                        /s/ Loretta C. Biggs
                                   United States District Judge